Mr. McLaughlin and Mr. Arce Yes, Your Honor, Dan McLaughlin is on the line. And so is Jimmy Arce. Arce, okay, excuse me. All right, so Mr. McLaughlin, you may proceed. Thank you, Your Honor. May it please the Court, Dan McLaughlin on behalf of Rumael Green, the appellant in this matter. The question presented by Mr. Green's appeal is whether a patrol officer employed by a private security company should be subject to the Fourth Amendment's prohibition on unlawful searches and seizures. And under the specific facts of this case, the answer to that question should be yes, that he should be subject to the Fourth Amendment's prohibition. And the facts surrounding Mr. Green's stop in this case are essential. And the district court in this case found that the facts surrounding the stop, that there was no reasonable suspicion to support the stop, but that because Officer Hudson was not a quote-unquote state actor, the Fourth Amendment ought not to apply. So why doesn't that mean that we don't really care? I mean, we'll accept the facts as the district court found them. He disregards Mr. Hudson's testimony. But we need to look at the relationship between the Chicago Housing Authority on the one side and this AGB investigative services on the other side. What powers do the people who work for AGB have? To what extent is it just a fill-in for the police force? And to what extent is it a private security force more along the lines of what we saw in the Wade case? So that seems to me the relevant question. Yes, Your Honor, I agree. And so the facts of what Officer Hudson was actually doing at the time of the stop, I think, go towards that question. And then I'd be happy to talk some more about the contractual scope of duties that the CHA demanded AGB to provide under the terms of the contract. So as to the actual stop, Hudson is on patrol, proactively patrolling the property, which is, of course, public property. It's a CHA building. And he entered the laundry room of that building and he performed a Terry stop. In other words, he didn't see a clear violation of the law occurring. He was not called to the scene to intervene. He walked up to a person sitting at a table and ordered him to stand up. Now, that action in itself, if the court considers, for example, let's say a just John Q. Public or Jane Q. Public resident of the Trumbull Park homes undertook those steps, just walked into the laundry room, walked up to somebody, and ordered him to stand up and put his hands on the table. That wouldn't fly. So in other words, Officer Hudson has greater authority. He has greater power than a private citizen. I don't understand what you mean at all. You mean that if somebody's sitting around in the laundry room talking to another person, as Mr. Green was, and just a resident, a person who is unequivocally not affiliated with the police, comes up and taps that person on the shoulders and says, I need you to stand up. I mean, it might be rude. It might be other things, but I don't understand why it couldn't happen. It seems to me it probably does happen. Maybe somebody's looking for something and they think he's sitting on it or any number of reasons someone might do that. So I don't see where you're going with that. Sure. And let me clarify, Your Honor. So where I'm going with that is certainly anybody could say those words, and anybody can frankly say whatever they want to somebody else. But the words wouldn't have the same effect if, say, I went in there and said, stand up, I think you're sitting on my magazine, or stand up, I don't like the look of you. And suppose you did say that. Suppose you said, stand up, I don't like the look of you. And instead of engaging with you, what happens is the other individual, as Mr. Green did, tries to zip out of the room, starts running away. I mean, you might think, boy, that's a little strange. But it certainly doesn't mean that the Fourth Amendment is implicated at all by this encounter. As I say, at the most, I could imagine common law battery or something of the like if you tap somebody on the shoulder. Right. And that's where you have to get into this continuum of cases. We have, you know, in Wade, we have the people who are in the lobby. We have other cases where it's mall security. We have other cases where it's, you know, people who are in the lobby. We have other cases where stores hire private guards to address shoplifting risks. There are a huge number of cases that involve private individuals who are trying to provide security. And most of them don't implicate the Fourth Amendment. The ones that do, even though I agree with you that an ordinance isn't necessarily magical, but universities, for example, often have arrangements with the local police that says, you know, say the University of Chicago police force has the powers of the Chicago police on the campus of the University of Chicago, which happens to be the case. And I believe Northwestern is the same. But those are sort of self-contained, almost governance units. And where do we see something like that here? Where do we see something more than just private security? So what we see, Judge, we do not have an ordinance in this case, as Your Honor pointed out, as Northwestern and apparently University of Chicago do. But what we have is a list of 13 contractual duties that the CHA gave to AGD and required them to perform. And those duties were put forth in the contract that was before the district court. And that includes identifying antisocial behavior patterns and addressing them, protecting residents and property, maintaining high visibility and preventing intrusion, vandalism, abuse, trespassing, wearing a uniform, etc. And so those duties put upon the employees of AGD and including Hudson an obligation that CHA oversaw and managed on an ongoing basis to go out and actively police, to go and confront the citizens of the Trumbull Park homes to effectuate these sorts of stops, investigatory stops. And what we have there is something that's much different, say, than the desk attendant in Wade, where superficially that's a factually similar case. But the guard in Wade, his job was to sit at the desk and check a list and make sure people signed in. And he was prohibited by his contract from leaving the lobby area. He was not, under the terms of the contract, required to go out and proactively police, which is a huge difference. Did Mr. Hudson have any authority beyond the limits of CHA properties? Does he have any? No, he does not, Your Honor. And so his authority is limited in CHA property because that's the authority that was delegated to him by the CHA. And that's the only basis for his authority is that delegation from the CHA. I'm just going to interject that you're approaching the end of your time if you want to save some. Yes, Your Honor. I did just want to very briefly say, Your Honor, and then I'll reserve the rest of my time for rebuttal. He testified that he enforced ordinance violations, and that is a greater power than a private citizen enjoys. And under the Illinois Code, a citizen's arrest can take place for a felony, but a person cannot arrest another person for an ordinance violation. So that's a very clear-cut difference between how Officer Hudson carried out his duties and the power that he was given and the power that a private citizen enjoys. And I'll reserve the rest of my time for rebuttal. Thank you. Thank you. Mr. Arce. Good afternoon, Your Honor, counsel, and may it please the Court. My name is Jimmy Arce, and I represent the United States. The district court properly denied defendant's motion to suppress and did not clearly err in finding that the private security guard who searched the defendant was not a state actor. So, Mr. Arce, can I tell you something that concerned me about your brief? The district court, as clearly as is possible, said that it had decided not to credit Mr. Hudson's testimony about seeing the butt of a gun or seeing something that he thought was the butt of a gun sticking up out of the waistband. And so as far as I was concerned, with that credibility finding, that fact was off the table. But you refer to it a number of times in your brief, indeed so often that it makes me think that you think that that's an essential point that needs to be there in order to sustain this entire decision. So I don't know why you didn't follow the district court's credibility finding. My apologies, Your Honor, and you are correct that the district court did not credit Mr. Hudson's testimony as it relates to him seeing the gun due to the fact that he invoked his Fifth Amendment rights during the suppression hearing. But as Your Honor noted, it does not change the outcome of this case one way or the other. Because as the record in this case demonstrates, the defendant was approached, pursued, and ultimately apprehended by a security guard employed by the Chicago Housing Authority. And this security guard was a private party and not a state actor. There was no ordinance or statute that transferred an exclusively public function to the security company. The contract at issue did not delegate such a function. And consistent with this court's precedence, his actions did not implicate the Fourth Amendment. So are you looking for a clear statement rule? There is this contract, which we have in the record, between CHA and the security company, AGB, and it seems to delegate quite a bit of authority to the people who work for the agency. Respectfully, Your Honor, the contract is a standard agreement for private security services. It called upon AGB and its employees, including Mr. Hudson, to perform tasks customarily associated with providing private security services. And in fact, the contract specifically reserved police powers for the Chicago Police Department, requiring AGB to alert the CPD if they were needed, which of course happened in this case. But, you know, aren't we supposed to look at the substance? I mean, you can put a paragraph in a contract that says anything, but you need to look at the substance of what was going on, not just the fact that it's a contract that a lot of security companies use. Maybe a lot of security companies should be considered the police for Fourth Amendment purposes. That's our question we're supposed to decide. Correct, Your Honor. And as you noted earlier, this court has addressed that very issue on a number of occasions. First, this court addressed that issue in Wade and found that because the security guard in that case was not performing an exclusively state function, that they were not a state actor. And again, that reasoning was confirmed again in Shaheed. And then repeatedly again in Miller v. Bond Leach Kennel Company and in Johnson v. La Robita Children's Hospital. And so the important question that needs to be addressed is whether or not the tasks that are assigned to or performed by the security company are exclusive state functions. And so in this case, at bottom, the defendant's argument is that because AGB contracted with a government agency, it transformed AGB and by extension Hudson into state actors. But again, that reasoning has been rejected by Wade and Miller and other cases in which this court has addressed that issue. But you know, Wade is quite different. Wade is these guys sitting in the lobby, basically, which makes you look like every single building in downtown Chicago back when it was open. So this, I mean, I think we want to look at this list of things. Some of them seem not at all like the police maintain respect for residents. But some of them ensure unauthorized people are not permitted on the property. And they've put it in the negative, but they say avoid using force except when necessary to protect persons and property. So you can turn that around and say use force when necessary to protect persons and property. Protection, antisocial behavior being stopped. You know, there are quite a few things that suggest that actual force is going to be used. Well, Your Honor, I will submit that the duties and tasks that were assigned to AGB are no different than the duties and tasks that you would see carried out by private security guards on private property, such was the case in United States versus Shaheen, where the private security guard in that case apprehended and detained the suspect pending the arrival of the police. And going back to your mention of the duties carried out by the security guards in Wade, although the guards in Wade were confined to the lobby area, this court noted that the security guards were able to carry firearms for use in case they were confronted with situations where they had to protect themselves or others. And they were also authorized to make arrests for trespassing pending the arrival of police officers. And further, Your Honor, none of the tasks that were performed by AGB or assigned to them fell within the state's exclusive function. In fact, in Miller versus Von Leash, this court listed the very few duties or tasks that have been found to fall within this category. One is the administration of elections, the operation of a company town, eminent domain, preliminary challenges, and jury selection. And moreover, the decision in Wade declared that making an arrest pending the arrival of police is not a power exclusively reserved to the police. And this reasoning, again, was affirmed later in Shaheed and in Miller. And while the defendant tries to make a distinction between citizens' arrests and arrests for ordinance violations, that distinction is not made in any of the cases that this court has confronted this issue, including Shaheed, Wade, La Robita, and Miller. And moreover, Your Honor, I believe that you addressed this earlier. There was no, AGB was not cloaked in authority in this case. There was no statutory delegation of full police authority. I thought we agreed, though. I mean, that would certainly be a very strong way of showing that there was a delegation. But is it your position that that's the only thing that we'll do, that we're operating under some sort of clear statement rule? No, Your Honor. But it is worth noting that the only time this court has ever found that a private security guard acted with full police power is when there was a statute ordinance delegating those powers to the police. And based on the government's research, that has happened on two occasions. First was the United States v. Hoffman, and the second time in Peyton v. Rush Presbyterian. And here, obviously, the defendant concedes that there was no statutory ordinance conferring police authority. And then the second prong espoused in Peyton also was not met here either, that there was no control or direction over AGB or the private security guard to conduct the detainment in this particular case. The defendant concedes that neither CHA nor CPD were aware of, much less directed the stop by Hudson. No, he seemed to be acting quite independently. Actually, it wasn't even his building, was it? He just happened to stop by, and he wasn't really patrolling. I think I meant to take issue with that earlier. He was wandering around looking for a friend and goes into the laundry room and decides to take some initiative, I suppose, is a nice way of putting it. Yes, Your Honor. He was on duty, and so he did have the authority to patrol the premises. And as he noted, he saw the defendant in the laundry room and decided to approach him and to ask some questions. That was within his authority, but as he testified during the suppression hearing, and as you noted earlier, he was not directed to stop defendant Green. There was no call from either CHA or from the Chicago Police Department that there was a search underway for a suspect on CHA property. So there was no knowledge, let alone direction, by CHA or the Chicago Police Department to stop this individual. And therefore, Mr. Hudson cannot be said to have been a state actor in this particular case. Okay, you are approaching the end of your time, so good time to wrap up. Sure. AGB and Hudson were expected to perform the same tasks as private security guards at private facilities. And just because they perform those tasks at a public facility does not make them state actors. And for those reasons, I ask that this court affirm the decision by the district court to deny the defendant's motion to suppress. Thank you. All right, thank you. Mr. McLaughlin, you have a little more than a minute. Yes, Judge. Very briefly, Officer Hudson's testimony was that he was on foot patrol. And I guess I'll pick up where the government left off, which is he was not responding to a specific call. He was not told to go to the laundry room. He was out proactively, essentially walking a beak, which I think, again, underscores the fact that this is not typical conduct that a private citizen would undertake, or even that a private security officer in a public facility like a CHA complex would undertake. And so, from the defense perspective or from the appellant's perspective, that simply underscores the fact that this is a particularly – it's a state power that he's going and carrying out. He's going out and interacting with public citizens and effecting carry stops. That is not a power that a private citizen enjoys. The situation in this case is far more expansive than Wade, and I think Your Honor already touched on that. And it's a much different situation. The case of Shahid and some of the other criminal cases that this court has looked at, frankly, present factually distinguishable scenarios. So what we have here, which is different than that line of cases, is we have a private security company that's contracting with the government. And so in Shahid, it's a private security company that's contracting with the mall. In some of the other criminal cases that this court has looked at, it's a UPS or a FedEx carrier that has no contractual obligation with the government. All right. I think you need to wrap up now, Mr. McLaughlin. Yes, Judge. We don't just have the contract, Judge. We have the CHA overseeing, managing, and supervising. And so, with all that said, Your Honor, I respectfully request that the court reverse the district court's ruling and vacate the judgment entered against Mr. Green. And I thank you. Thank you. Thanks to Mr. Arce as well. The court will take the case under advisement, and we will be in recess.